It is Muni v. United States 24-1028. Counsel, your last name, Dangaran? Yes, Your Honor. Please come on up. Good morning, Mr. Dangaran. Good morning. D. Dangaran, they, them pronouns for the appellant, Mr. Rolando Muniz. I'd like to reserve three minutes for rebuttal. May it please the court. The district court erred by finding at step one of the Bivens analysis that Mr. Muniz's claim arose in a new context. I'm happy to discuss any of the Abbasi factors under step one if this court would like me to. Let me ask you one of the threshold issues I think we have. Yes. And that is, is the PLRA and remedial measures. Is that something we should or can consider at step one to distinguish it? I'm happy to dedicate my entire argument. Not entire, but that's an important issue. Yes. So, alternative remedial schemes, specifically the BOP's administrative remedy program, are a valid consideration under Bivens step two only. I note at the outset that the district court did not address alternative remedies at step one, so this court should not either. This court made that precise preservation decision in Cross versus Bushman, number 22-3194, an unpublished decision issued July 3rd, 2024. When it held that a Bivens remedy was available where a plaintiff sued a prison doctor who failed to treat diabetes. So very similar context is here. Moreover, defendants have never raised this argument either before the district court in their motion to dismiss or in their answering brief. So they have not preserved it for appeal. But if this court wishes to reach it to a sponte, which it should not, there are two main reasons why this court should not consider the administrative remedy program, or I'll call it the ARP, as a step one factor. First, the structure of the Supreme Court's decisions in both Abbasi, that created the two-step framework, and in Egbert, the most recent decision from the Supreme Court on this issue, discussed the ARP and considered the ARP as a step two factor. The Ninth Circuit's recent decision in Watanabe versus Dare reached that conclusion and held that the ARP should not be a step one consideration. Second, kind of on the merits of this question, considering the ARP at step one would abrogate Carlson despite the Supreme Court's clear statements that it remains good law. It would pretty much gut him. Exactly. Going forward. That's because every single prison case brought under Carlson must also be brought under the ARP first. And therefore, Carlson would have been overruled sub silencio by Abbasi's very own two-step framework creating this ARP at step two if the court holds that it also applies at step one, while in that very same breath, the court said Carlson is good law. And we believe that this cannot be the case. So turning first to the structural argument, as the Ninth Circuit recently held in Watanabe, Egbert discussed alternative remedial schemes as a step two consideration. This court's decision held pre-Egbert in Dongara and Mack versus Yost and post-Egbert in Shee versus Hogan also discussed alternative remedial schemes at step two only. And because, again, Egbert's the most recent decision we have from the U.S. Supreme Court, the fact that it put the alternative remedy procedure at step two is significant and bears significant weight in this court's analysis of this question. Second, Abbasi is instructive because it created the two-step inquiry. It listed, quote, the presence of potential special factors that previous Bivens cases did not consider as one of the step one inquiries. And that's where the argument might arise and some circuits have found arise that the ARP is one of said special factors. But these special factors discussed at step one have actually included matters of border control and national security invoked in, for example, Hernandez versus Mesa or Abbasi itself with 9-11 and the terrorist issue. So Abbasi itself discussed alternative remedial schemes not as a special factor under that step one language but under the step two language of special factors that might create hesitation before a court is to expand the Bivens damages remedy into a new context after that new context has already been understood. So if you read Abbasi itself, it's described as a limit on judicial inferences and that once you've found a new context, it's a reason to refrain from providing the damages remedy. It is not itself a reason to find a new context. Is this a new context case? No, Your Honor, this is not a new context case. This is on all fours, I think is what we said in our brief with Carlson. Let me ask you a question. Yes. That seems to be at least a factual distinction and I want to understand why it isn't enough to make it not on all fours. Does the fact that your client's situation wasn't an acute emergency make it distinct? If not, why not? No, Your Honor. So I have two responses. First, in general, questions as to what the Eighth Amendment harm is or what exactly under those emergent circumstances the severity of the injury or the bad actions might have been, that goes to the merits of the Eighth Amendment inquiry. And the Bivens question is an antecedent question to the merits. So there are various forms of medical adequate care cases that can be brought under the Eighth Amendment. And the Bivens question just describes the world that we're in as addressing those issues altogether. Notably, in the context of Carlson cases described by Egbert, is the failure to provide proper medical attention. It does not list emergency. It does not list asthma. It's the failure to provide proper medical attention. And so going any more specific than that, as Watanabe found in the Ninth Circuit, is actually looking to the merits rather than this Bivens inquiry. And so the other cases that would support the severity or emergency situation as irrelevant include this court's decision in Cross, as we cited in our brief, Vaughn v. Bassett from the Fifth Circuit, Standard v. Dye, and Watanabe from the Ninth Circuit. So there is no special consideration given the emergency context of the medical care provided, because that is precisely what the Eighth Amendment inquiry is meant to look into. It might affect the amount of damages one might receive. It might affect whether the Eighth Amendment survives the subjective deliberate indifference prong. But it would not be reason at this very early stage to prevent the plaintiff from pursuing the Bivens remedy altogether. And I will note that Cross v. Dutchman is very helpful here, because it was a diabetes case. The plaintiff did not die. There was no emergency context. Another helpful Eighth Amendment case, just to look to the merits, if your honors wanted to, in Perkins from this court, which we cited in our reply brief, a plaintiff was prevented from accessing diabetes medication as well. And in Dermer v. O'Carroll, we discussed this in the qualified immunity section of our brief, but it's helpful for this question, physical therapy was delayed or denied. And that was a prison medical deliberate indifference case that was found viable. So severity is really not a factor that should go to this Bivens context. Turning back to why Carlson would be abrogated. As I previously stated, Abbasi created the two-step inquiry and stated that Carlson was good law, and the court refused to overrule it. If the ARP differentiates all prison cases from Carlson, then Abbasi would have said Carlson was good law and yet subtly overruled it. So first and most importantly, the ARP was in place when Carlson was decided. The ARP was created in 1979, and Carlson was decided in 1980. So in terms of the presence of special factors, the ARP was present when Carlson was decided at the Supreme Court level. Second, when Congress passed the PLRA, the Prison Litigation Reform Act, in 1995, it made the policy choice that incarcerated plaintiffs can bring Bivens claims so long as they exhausted the ARP first, overturning the Supreme Court's decision in McCarthy v. Madigan, where the Supreme Court held that a plaintiff in federal custody did not need to exhaust the ARP before bringing a Carlson claim. Congress could have decided in that fell swoop to say that the ARP altogether displaced the Bivens remedy, but instead it made the more modest decision to extend the exhaustion requirement to apply to Bivens claims. So Congress cannot possibly have intended the grievance procedure to displace Bivens actions. Accordingly, in Porter v. Nussel, the Supreme Court held that federal prisoners suing under Bivens must first exhaust the Inmate Grievance Procedure, or the ARP. And this Court held in Bistreon that, quote, So the Court would need to overturn Carlson if the ARP barred all future Carlson claims like Mr. Moniz's, it hasn't, and nor should this Court. Let's assume we agree with you. We don't apply to Step 1. What happens to Step 2? So, Your Honor, we don't think you need to reach Step 2. Because you're on all fours with Carlson. Exactly. And we would even go so far as to concede that because of the ARP and the way that it would dictate what occurs, the ARP is a Step 2 relevant inquiry. And so plaintiff loses at Step 2, as would every single other person with a prison medical care claim brought under Carlson, if it is found in new context. So Step 2 for this specific claim, because of the existence of the ARP, is where plaintiff would lose, which is why the entire battle is about Step 1. And so this fact that, you know, there's a strong presumption that circuit courts cannot determine that the Supreme Court has overruled its own precedent, sub silencio. And so Carlson remains good law according to the Egbert Court. And that means that at Step 1, there must be a really close examination of whether a case is a Carlson claim or is a prison medical deliberate indifference claim. I'll maybe just dwell on Step 1 for a little bit longer. Dr. Lopez de La Salle and the Doe officers are at the same rank of the other officers in Carlson. They were medical providers at the facility level, just like the doctors and medical officials named in Carlson. These are the Abbasi factors I'm walking through. Going to the generality or specificity of the action, again, we're in the world of inadequate provision of medical care, including a delay in care. Importantly, Carlson included a delay of a transfer, an eight-hour delay of providing asthma medication and emergency medical attention. That delay is precisely what our client is alleging. There was a delay in treating his wounds, a delay in giving him diabetes medication, and that led to the amputation of his toe because of diabetic ulcers. The removal of care is the same type of provision of care that should not have been provided. It's inadequate provision of medical care that we see in Carlson. Removing his soft shoe pass that created further harm is on all fours with Carlson. The extent of judicial guidance, Estelle versus Gamble, predated both instances. And there is no further risk of disruptive intrusion because both of these raise the precisely same medical care claims that would disrupt the executive branch altogether. And so because they're both Eighth Amendment claims, there's no further risk of disruptive intrusion here. And for all these reasons, there is really no new context or meaningful difference that would create a new context when looking at this claim. Why don't you address the qualified immunity argument for a bit? Yes. So the specific constitutional right at issue is the refusal to provide prescribed care or treatment of a serious medical need, including for non-medical reasons. And this court established this clearly in Monmouth County, Correctional Institutional Inmates versus Lanzaro. And that was the intentional refusal to provide care. Abu-Jamal versus Charestis, which was a hepatitis C medication case. Dermer versus O'Carroll, like I already said, where physical therapy was denied intentionally. And most importantly, Perkins, where the plaintiff was prevented from accessing diabetes medication. Thank you, Your Honors. I'll save my time for rebuttal. Good morning, Mr. Stinson. Good morning. Good morning, Your Honor. Nice to see you again. May it please the court. I'm Assistant United States Attorney John Stinson, and I represent the appellee, Dr. Abigail Lopez de la Salle. In all respects, this lawsuit resembles a medical malpractice claim and, in fact, was a medical malpractice claim against the United States. Not a constitutional claim for deliberate indifference. The court below dismissed Mr. Muniz's... How is this case dissimilar from Carlson? There are multiple ways that it's dissimilar, Judge Sirica. I would say that the primary way here is that Mr. Muniz was seen by a qualified physician when he arrived at FCI Ferryton. She made an informed decision about his medical care. She reviewed all of his conditions, and he had several. That's in the record. The medical record for that intake is part of our appellate record. And she continued some of his medical care for some of his conditions and changed it for others. She changed the care for his diabetes because he shifted from being in the diabetes range to the pre-diabetic range. And in doing so, she followed BOP guidance for diabetes care. So whereas in Carlson you had an inmate, Inmate Jones, go into extremis for a condition that everyone at the facility in Terre Haute was aware of, and that needed immediate medical care, and he was not provided medical care in the face of that crisis. Here we have a doctor basing a medical decision on past medical history, very recent test results, and making a determination that is within the guidelines for BOP, and arguably within the guidelines for the standard of care for diabetes care nationwide. And she put in a check-in beyond that. So she said, four months, we'll check you again. And if things have changed, if your concerns come to light, then we will revisit, and we might put you back on the met form and medication. So we have a process here where a qualified physician saw him, provided appropriate care, and a follow-up and a plan. So I think that distinguishes or differentiates this from Carlson pretty clearly. And I would use this opportunity to mention something that my opponent just said, which is that Eighth Amendment is a failure to provide proper medical care. A failure to provide proper medical care actually is a way of stating a medical malpractice claim. And I think that the deliberate indifference in the medical context is a much more severe standard to meet. I think that we meet either standard, but the question in this case is whether we actually have reached a deliberate indifference question at all, Your Honor. How do you distinguish this case from the Ninth Circuit's opinion in standard? I'm sorry, I didn't hear you. How do you distinguish this case from the Ninth Circuit's opinion in? In Watanabe. Watanabe, I'm sorry. So there are three cases that Mick Stangaran mentioned, which I think all fall into the kind of discussion that I'll provide, Your Honor. In Watanabe, we had what I think really amounts to a failure to provide medical care where there was a serious risk. That is the Eighth Amendment standard that we're working with. It comes straight out of Farmer v. Brannon. In that case, in the Watanabe case, the plaintiff was a victim in a riot in a federal facility in Honolulu. He was struck with a sock that had heavy metal parts in it, and he shattered part of his spine. So I think we can all agree that's a very serious condition to have. He was expressing pain. I think there were signs of the assault that he had sustained, and he was told by a prison medical nurse that he would get nothing but over-the-counter medication. He described his pain. He described what happened to him, and he was not seen either by someone inside the facility who could assess the very, very serious spinal injury that he sustained or provide him with proper care. And it was found later that shards of his spine actually sheared off and lodged into the soft tissue around the spine. So you have someone in a medical position who could have made a decision there to send him out for the kind of care that he needed, an MRI, an X-ray, and the kind of care that he needed. And that was denied, even though he was seen. Here we have a doctor who saw Mr. Muniz and made a reasonable decision, even if it was a decision that Mr. Muniz disagrees with, even if it was a decision that did go down the path that Mr. Muniz predicted would happen. It was still reasonable and appropriate within the guidelines. I just want to understand something. So initially when you distinguished the Carlson decision in response to Judge Sirica's question, as I understood your answer, you basically said, you know, Carlson was in a situation where there was essentially no medical care. Here there was medical care, not only medical care, but medical care that's consistent with national standards. The decision to take him off metformin was based on the fact that he went from diabetic to pre-diabetic. There was a check-in scheduled for three or four months later. Those are all consistent with national standards. And you made the point to say that, you know, when we're talking about an Eighth Amendment claim, you're talking about deliberate indifference, not proper medical care. But when you distinguished Watanabe, it sounded like you were talking about proper medical care. It sounded like your distinction of Carlson fell apart a little bit. It's not a no care versus care. It's the distinction that I then heard was that's clearly not proper care versus this is proper care. What do we do with that? Are we at this stage supposed to determine whether or not the care was proper or not, or is the analysis whether or not there was care or not? I'm trying to understand how the distinction of Carlson and the distinction of Watanabe work together. I do follow you, Judge Montgomery-Reeves, and I appreciate the distinction that you've made. I do think that what the Ninth Circuit found in Watanabe was that the way that the nurse at FDC Honolulu addressed the plaintiff was beyond the pale. It was not something that you could put into the context of appropriate medical care. Now, the Eighth Amendment standard is that there's a serious risk of medical harm, and there is the subjective deliberate indifference to that. So that's knowledge of the risk and a knowing decision to not do something appropriate in response to it. And that's where I think that Watanabe arguably, and I'm not arguing the Ninth Circuit case is right or wrong, but that is where I would say that the Ninth Circuit turned the deliberate indifference decision. So someone who has just been beaten with a metal object and is saying that they're having intense pain and is told essentially to take Tylenol, there is a serious risk after that kind of fight that happened and the kind of symptoms that Mr. Watanabe was discussing with the medical professional. That is something that warrants, again, an X-ray, an MRI, some kind of a consult with someone who can deal with assault of trauma or something of that nature. So I think that the deliberate indifference question there is you knew that there was a risk of serious medical harm and you did something that was very, very inadequate, that was not within any kind of standard of care, that was not really care at all. I think that that's the distinguishing factor here. The other thing that I would mention, I don't want to jump forward too much, but Judge Restrepo asked about the qualified immunity considerations, and I think that those come into this question as well because that's a two-pronged examination and either one can be dispositive for the government in this case. The first one is whether there's a failure to state a claim. And again, I think here there is a failure to state a claim of Eighth Amendment deliberate indifference. Watanabe, I think that's a clear stated claim. At a 12B6 review, that will clear it pretty much every time. Someone gets beaten with a metal pipe in a riot in a federal prison, they should be seen. If someone thinks that they may have damage to bone, damage to their spine, they should get a medical imaging study immediately. Here, however, we have someone who had a long-time history of diabetes, a long-time history of care, but had a very positive test result. I think the record that Mr. Muniz provided said that as of June of 2019, he was at 6.1, which is clearly in the pre-diabetic range. He was seen about a month after that point in early July, and there was a decision made that was within the standard of care. So he received an examination. He was heard by the doctor. He told the doctor, I think I should stay on metformin. I think once I start eating the regular chow here and being in the general population, I'm going to return to the diabetic range, and that's going to put me at risk. She said, okay, I hear you, but my decision is that you don't need metformin because you're pre-diabetic, and we'll come back in four months and hear about that again. So the difference here is that we have someone who could be very, very severely injured in Honolulu, who really got no real care or medical imaging or examination at all, as compared to Mr. Muniz, who was seen, the data were considered, the recent tests were considered. He was heard out directly by the physician, and the physician did not give him what he asked for, and that's clear in the record. But she did say, we will revisit this. I take your concern seriously, and I take your condition seriously. Counsel, can you respond to the argument from your friends on the other side about whether or not, about when we should consider the BOP remedies at step one or step two? Absolutely, Your Honor. Mixed Dan Garan and I disagree about many things in this case, but I think our position is going to be very aligned on this one. The Supreme Court said that a case can present a new context if it involves special factors that previous Bivens cases did not look at, and that is true, and that's a step one inquiry. And we argued out in our brief that special factors can be looked at at step one. So I understand the panel's question. I know where it comes from. I think it's an appropriate question to ask. However, we think that the alternative remedial mechanism is something that is better left to step two. We didn't ask or argue in favor of looking at it at step one. This case involves a whole different set of claims. We think that there are a lot of reasons why we clear the step one inquiry, and we don't need to just look at the ARP. And I think that there are ways of looking at the Court's question and not silently abrogating Carlson, and I could go into that if the judges are interested. But we don't think that this Court needs to risk that question at this point. We think that you can find a new context in this case without looking at the ARP at step one. So would you agree that if we were to consider that at step one, the ARP at step one, it would, in essence, reverse Bivens, that nothing would survive? I don't know. I don't know that that's the case, Your Honor, with respect to Carlson. I think that Bivens is a different matter. I don't know that there wouldn't have been an alternative remedial. Carlson claims. Carlson claims. It would be impossible to bring a Carlson claim. Well, I'm not sure that that's the case, Your Honor. I mean, I think that it would significantly limit the scope. I think it would. And, again, the position of Dr. Lopez de la Salle here today is that there's no need to make that kind of step here. I will say, Your Honor, since you've asked the question, I think the question would turn for Carlson on whether a remedy was actually available to inmate Jones. And I don't mean whether the ARP existed. I mean, would there be something? Let's assume that it was available back in 1975 in August in Terre Haute when he passed away. I think when he began to have his asthma attack, there was no paper remedy that was going to get him what he needed, which is transportation to a hospital. So there may be circumstances where the availability of the remedy is factually, well, factually speaking, it would not be available. So I think that Carlson could be saved. Other kinds of cases could be saved. Watanabe, I don't know whether that could be saved if this Court makes that decision. But again, our position is that we don't need to go that, Your Honors, don't need to go that far in this case, because we think we have many, many reasons that we survive at Step 1. So give us your three or five best reasons you survived at Step 1. What distinguishes this from Carlson? Top three. Absolutely. So the main concerns that we have, and this would come in as a special factor looked at at Step 1, but it also comes in under what the Supreme Court in Abbasi called risk of judicial intrusion into the functioning of an executive branch agency here, the BOP. So the three, and I'll go into detail if the Court wants, although I'm running out of time. Don't worry about the time. We would be intruding, the Court would be intruding into BOP clinical guidance for diabetes, which we've talked about. The Court would essentially be reaching down and saying the guidelines may say something, but we are going to put individual doctors or PAs potentially at risk of a constitutional damages remedy if you don't honor what the inmate says. So that's number one, risk to the clinical guidance for diabetes and other types of chronic care. Secondly, more broadly, physician discretion in providing treatment plans. So Mr. Munez came in. He was seen by Dr. de la Salle. She looked at all of his conditions. She set forth a treatment plan for him for all of them. Some of them stayed the same. Some changed. If you start to impose a constitutional remedy there, you have doctors looking over their shoulders and saying, well, look, I'm going to have to do what the inmate wants because of what happened in this other case. Carlson talks about that. They say that the constitutional remedy is intended to adjust behavior, and we don't really want to adjust physician discretion when it's appropriately used. And, again, there's the availability of a medical malpractice action if it exceeds or goes somewhere beyond the standard of care. So that's the second one, physician discretion. And the third one is BOP practice when conducting routine transfers. So Mr. Munez came from FCI Yazoo to FCI Ferreton in New Jersey, and he had a medical condition of diabetes. Very common, dealt with in every single BOP facility across the country. But potentially a Bivens remedy, a Carlson remedy in this case, you would have an understanding among the receiving facilities that they need to maintain the exact medical program that existed at the prior facility if that's what the inmate wants. And that would be irrespective of what the medical test said. It would be irrespective of any changes in that inmate's status, medical status. If the inmate said, I was getting this at my prior facility, I want the same thing here, instead of BOP conducting an individualized medical review upon receipt at the new facility, which is appropriate and good policy for BOP to enact, we'd be in a situation where the inmate gets to dictate care, which I don't think is necessarily good for the inmate, and it's certainly not good for the institution. Is there no further questions? Thank you. Thank you, Your Honors. Thank you, Your Honors. Just quickly, I'd like to walk through what exactly Carlson discussed. Why don't you start with where your colleague left off on how he distinguishes this case from Carlson. Yes. So he said BOP policy and clinical guidance practices is one. Physician discretion is the second and transfers is the third. All three were present in Carlson. Carlson claimed the delay of a transfer to a hospital. I know that's not the same as transferring to another facility, but it involves transfer procedures and getting someone into a van to leave the facility and go somewhere else. In terms of the physician discretion, there was discretion in administering contraindicated drugs that made his attack more severe, failing to give him competent medical attention for eight hours. These are all things that go to the discretion of the physicians. And finally, in terms of BOP policy and clinical guidance and practices for diabetes, that's the case for every single medical condition claim. That would have been the case for how to treat asthma in the Carlson context. That argument was actually one that was raised in Watanabe as well. This policy discretion or trying to broaden an individual's claim to a policy level decision. But that's not really applicable to a medical care context. The plaintiffs here in these settings are saying that we are bringing individual claims for the lack of providing the adequate medical care. The policy itself is providing adequate medical care and relying on the medical officials. You can see this in Watanabe at page 1040. The Watanabe court says the district court characterized Watanabe's allegation as an interference with the proper diagnosis and treatment of his injuries by denying his request to be taken to the hospital and distinguish this from the claim in Carlson, which the court characterizes largely based on treatment provided during a medical emergency. The same language that we hear from defendants today. And the Ninth Circuit overruled that understanding and that analysis because that goes to factors that just do not create the nature of the claim, is not a distinction that actually creates a new context, is what the Ninth Circuit said. The Ninth Circuit also said that they were required to accept the plaintiff's well-plead allegations as true and emphasize that they did not make any determinations as to the merits of his claim. Rather, they're concerned only whether the allegations present a claim that is sufficiently analogous to the one in Carlson. Everything from my friend on the other side today goes to the merits question. Comparing the deliberate and different standard to medical malpractice, bringing up the standard of care that is applicable. Those are merits inquiries. Those are precisely the kind of inquiries that would take place after the motion to dismiss stage, actually, because the standard of care would not come up at the motion to dismiss stage. That's something for summary judgment. The phase that we're at right now is a clear allegation of a medical care claim, of lack of providing adequate medical care claim, and that's the language that we hear from Egbert. Egbert literally said that Carlson was, quote, a federal prisoner's inadequate care claim under the Eighth Amendment. That's how they described the context that is the Carlson context. Everything else that my friend on the other side has argued actually goes to the merits and, therefore, do not create a new context. And for that reason, we believe that you should reverse and remand. Thank you very much. Thank you, Your Honors. I thank both counsel for their outstanding arguments and briefs. And we're going to ask that the transcript be provided to the court, and we'll have the government pay for it. Yes, Your Honor. Thank you very much. Have a great day, folks. Thank you.  The hearing is adjourned. The hearing is adjourned.